UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                    Criminal Case No. 23-20295

TYRONE ZACHARY SAWYER,      Sean F. Cox
                                           United States District Court Judge

    Defendant.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

In this criminal action, Defendant Tyrone Zackary Sawyer ("Sawyer") is charged with one count of Sexual Exploitation of Children, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). The matter is currently before the Court on Sawyer's "Motion to Suppress Involuntary Statements." After the motion was briefed by the parties, on November 3, 2023, this Court held an evidentiary hearing and heard oral argument. For the reasons that follow, the Court shall GRANT the motion and suppress the statements that Sawyer made to law enforcement officers on April 26, 2023.

**BACKGROUND**

In this criminal action, Defendant Sawyer is charged with one count of Sexual Exploitation of Children, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). The Indictment also includes forfeiture allegations.

The charges stem from the execution of a search warrant at a Madison Heights, Michigan apartment that Sawyer resided at with his mother. The search warrant was executed on April 26,

2023. It was on that date, while the officers were at the apartment, that Sawyer made the statements that he now asks the Court to suppress.

On July 28, 2023, Sawyer filed his "Motion to Suppress Involuntary Statements." (ECF No. 19). In it, Sawyer asserts that his statements to the police were obtained in violation of his constitutional rights. Sawyer asserts that the officers elicited his statements after he invoked his right to an attorney under *Miranda*, and thereby violated the bright-line rule to stop questioning adopted in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Sawyer also asserts that, rather than ceasing all questioning, the officers responded by threatening to rip his home apart if he refused to help and their threats rendered his confession involuntary.

In support of his motion, Sawyer filed audio recordings of the interrogations at issue, along with a written transcript of what can be heard on those recordings. The audio recordings, however, do not capture all of the relevant conversation, as portions of it are inaudible.

The Government responded to Sawyer's motion by asserting that Sawyer never made an unequivocal request for an attorney and his statement was voluntary. The Government concedes that the officers' statements about tearing the apartment up "were inartful and likely not advisable," but contends the totality of the circumstances do not render Sawyer's statements involuntary. (Govt.'s Br. at 8).

With the issues so framed by the parties, this Court scheduled an evidentiary hearing to take place on November 3, 2023, and ordered each party to submit a witness list. Sawyer's counsel advised that the defense does not intend to call any witnesses at the hearing. The Government identified the following three witnesses that it intended to call: 1) Special Agent Matthew Hughes, F.B.I.; 2) Detective Indasha Gray, Southfield Police Department; and 3)

2

Sergeant Craig White, Madison Heights Police Department.

This Court held the evidentiary hearing on November 3, 2023. At that hearing, the Government called Special Agent Matthew Hughes to testify. The Government did not call either of the other two witnesses it had identified as potential witnesses.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witness who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the other evidence admitted at the hearing and the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Special Agent Matthew Hughes ("Hughes") has been employed as a special agent with the Federal Bureau of Investigation ("F.B.I.") for just over four years.

Hughes received training at the F.B.I. Academy in Quantico, Virginia. He received training in interviewing suspects. Hughes testified that, during that training, they spent a lot of time learning about *Miranda* warnings and how they work.

Hughes is currently assigned to the Southeast Michigan Trafficking Exploitation Crimes Task Force for the F.B.I. and was working on that task force in April of 2023, when he became involved in a criminal investigation of Sawyer. Hughes had received information from the Southfield Michigan Police Department that a complainant had filed a report that Sawyer had leaked an image of the two of them engaged in sex to an online platform. The complainant was fifteen years old. Sawyer is twenty two years old.

Hughes opened a case on the federal level through the F.B.I. and obtained a search

warrant for Sawyer's residence. It allowed the officers to search the residence at issue, a Madison Heights, Michigan apartment that Sawyer lived in with his mother, and to search Sawyer's person. Hughes was interested in finding Sawyer's cell phone because he believed that the video at issue was recorded by a cell phone.

Hughes went to the apartment on April 26, 2023, along with ten to fifteen other officers, to execute the search warrant. They knocked on the door just after 6:00 a.m., an early time of the morning when it is not uncommon for people to be asleep.

The officers did a "knock and announce," wherein they loudly announced that they were the police, were there to execute a search warrant, and asked that the door be opened.

Hughes testified that they waited approximately 45 seconds after announcing their presence for the door to be opened. Hughes does not recall hearing any movement from the inside of the apartment during those 45 seconds. After waiting 45 seconds, a task force officer broke the apartment door down with a battering ram.

At this time, multiple officers had their guns drawn. After the door was breached, the officers saw Sawyer run toward the back of the apartment. But Sawyer's mother came to the door within thirty seconds or so and, after she called for him, Sawyer came to the door also.

Sawyer's mother was very distraught about the door having been broken down and was loudly crying and saying that she was worried they may get evicted from the apartment because of the damage to the door.

Sawyer and his mother were initially placed in handcuffs. After determining that no other persons were in the apartment, the handcuffs were removed from both Sawyer and his mother.

Hughes testified that he believed Sawyer was guilty of the offense at issue and believed

4

that if Sawyer answered his questions he might implicate himself in the offense. In other words, Hughes's goal was to get Sawyer to make a statement or give a confession.

Hughes testified that he understood that Sawyer was in custody and was therefore entitled to *Miranda* warnings. Hughes acknowledges that sometimes a written form is used when giving a suspect their *Miranda* warnings:

> Q. All right. So, now, there's a couple of different ways that you can approach *Miranda* rights with a person, right? You can physically print out a form and have the person review that form, correct?
> A. Yes.
> . . . .
> Q. Okay. So on that – on that written form, you're – say you're pretty familiar with it, correct?
> A. Yes.
> Q. There is a place on the form for the person to sign, right?
> A. Yes.
> Q. And on that form, they can – they will acknowledge that, yes, I understand my rights, correct?
> A. Yes.
> Q. And that they're agreeing to talk to you without the presence or assistance of a lawyer, right?
> A. Yes.
> Q. And then you can have the person just certify all of that in writing, correct?
> A. Yes.
> Q. And there's space on the form for witnesses to sign, correct?
> A. Yes.

(11/2/23 Hrg.).

Hughes did not use a printed form like that while giving Sawyer his *Miranda* warnings and thus did not obtain Sawyer's signature on such a form.

Rather, Hughes verbally advised Sawyer of his *Miranda* rights by stating the following to Sawyer:

> So, before we ask any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You

5

> have the right to talk to a lawyer for advice before we ask any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. And, if you di- decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

(Govt.'s Ex. 1). Hughes testified that he may have been reading from a card he carries with him or it is possible that he was working from memory. In any event, Hughes acknowledged that he read through the *Miranda* warnings with Sawyer very quickly:

> Q. And so you understood that he was in custody and entitled to *Miranda* warnings?
> A. Yes, ma'am.
> Q. All right. And so you recite these – these rights aloud to Mr. Sawyer?
> A. Yes, ma'am.
> Q. And you listened to yourself on the recording a few minutes ago, correct?
> A. Yes.
> Q. You were able to get through those rights in about 20 seconds, weren't you?
> A. Yes.
> Q. Kind of ripped right through them, would you agree with that?
> A. Yes.

(11/3/23 Hrg. Tr.).

Hughes acknowledged that another option, even if using his card, would be to go through the rights individually with the suspect. One of the benefits of doing so is to make sure the suspect understands or comprehends the rights and that there are no issues with intelligence or competence.

Hughes did not do that here. Rather, Hughes just quickly read the rights aloud to Sawyer and did not ask him any questions, such as how far he went in school or whether he was under the influence of alcohol or drugs.

After the twenty-second reading of his rights, Hughes did not ask whether Sawyer whether he wished to waive his rights and speak with him and the other officers. Hughes just

proceeded to ask Sawyer a question about Xvideos and Sawyer responded, "I know the porn site."

When Sawyer was asked if he had a profile on the site, Sawyer shrugged his shoulders and gave no verbal response. Another officer then asked "I'm sorry, when you do that, what do you mean?"

It is at this point that Sawyer said "I'll have my lawyer . . . I want a lawyer." Sawyer and Hughes then talked over one another, with Hughes saying "you want your lawyer? Okay," and Sawyer responding "I'd rather listen" and "I don't wanna talk."

Hughes then responded, "well, it's really one thing or the other. Like, we can talk to you a little bit about why we're here, or you can have a lawyer."

Hughes also proceeded to say "and here's the, here's the situation, right? Like, you can either help us out, or we're gonna tear this house apart and leave it in shambles when we're done. So, we're looking for your cell phone. So if you wanna start with telling us where your phone is, that would go a long way toward helping, or we're just gonna spend a few hours here just tearing it apart."

A female officer then added, "your mom's already stressed out in there, you know? You see how she is, she's very emotional" and I don't know how she "would deal with us ripping this entire place apart now."

Hughes then said that they would have to put both Sawyer and his mother back in handcuffs and "move you guys around as we're going through stuff."

Sawyer then stated that the officers already picked his cell phone up and stated it was "the blue one."

A few moments later, Hughes said he appreciated Sawyer being honest with them and "that's a big start for us here, okay? So I understand you said that, you know, let me be clear 'cause you did say you wanted a lawyer. Do you wanna talk to us or do you want a lawyer?" Sawyer again responded he was "listening" and Hughes said "again, that's not really an answer to my question, either you want to talk with us or you want a lawyer." Only then did Sawyer say "I'm willing to talk." Sawyer then proceeded to answer questions and made incriminating statements.

## ANALYSIS & CONCLUSIONS OF LAW

"Under *Miranda v. Arizona*, 'the prosecution may not use statements ... stemming from custodial interrogation of the defendant unless' law enforcement officials advised the defendant of his 'right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

Here, it is undisputed that Sawyer was "in custody" for purposes of *Miranda* and was therefore entitled to *Miranda* warnings.

Sawyer asserts that the officers elicited his statements after he invoked his right to an attorney under *Miranda*, and thereby violated the bright-line rule to stop questioning adopted in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). As explained below, this Court agrees.

The same argument was made in *United States v. Potter*, 927 F.3d 446 (6th Cir. 2019)

and, more recently, in *United States v. Zakhari*, __ F.4th __, 2023 WL 6967568 (6th Cir. Oct. 23, 2023). In *Potter,* the Sixth Circuit noted that "*Edwards* held that the police must immediately cease questioning if a suspect invokes the *Miranda* right." *Id*. at 450. It explained the same thing in *Zakhari*:

> Once a person communicates "his desire to deal with the police only through counsel," he is "not subject to further interrogation by the authorities until counsel had been made available to him." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). At that point, all questioning must cease. *Id.* (citing *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)).

*United States v. Zakhari, supra,* at *4. "This 'bright-line prohibition' prevents investigators from 'wear[ing] down the accused' in 'explicit or subtle, deliberate or unintentional' ways so as to convince him 'to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id*. (citing *Smith, supra*).

"The burden is on the government to show a proper waiver of the right to counsel." *United States v. Zakhari, supra*, at *4. The government has failed to meet that burden here.

To be sure, the "Supreme Court in *Davis* set a high bar to trigger *Edwards*. To compel officers to end questioning, a 'suspect must unambiguously request counsel.'" *Id*. "So 'ambiguous or equivocal' requests for an attorney do not put reasonable officers on notice that the interrogation must stop." *Id.*; *see also Zakhari, supra*, at *4 (explaining that, under *Davis*, "[t]o invoke the right to counsel, the accused must make a 'statement that can be reasonably be construed to be an expression of a desire for the assistance of an attorney.'"). "Any ambiguity must come from the statement itself or what led to it. It is 'intolerable' to '[u]s[e] an accused's subsequent responses to cast doubt on the adequacy of the initial request.'" *United States v. Zakhari*, *supra*, at *4. That is because "'[n]o authority, and no logic, permits the interrogator to

9

proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.'" *Id.* (citations omitted).

In *Potter,* the Sixth Circuit recognized that "*Davis*'s clear command has doomed several *Edwards* claims in our circuit," explaining:

> Take, for example, the statement "I think I should talk to a lawyer, what do you think?" Was that an unambiguous request for counsel? No. *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011). How about " '[i]t would be nice' to have an attorney"? Insufficient. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994); *cf. Henness v. Bagley*, 644 F.3d 308, 319–20 (6th Cir. 2011). Or "I really should have a lawyer, huh?" Equivocal. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see also United States v. Amawi*, 695 F.3d 457, 484–85 (6th Cir. 2012). For what it's worth, other circuits have likewise rejected *Edwards* claims based on similar statements. *E.g., United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014); *United States v. Havlik*, 710 F.3d 818, 821–22 (8th Cir. 2013); *Soffar,* 300 F.3d at 594–95; *United States v. Zamora*, 222 F.3d 756, 765–66 (10th Cir. 2000); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000); *Diaz v. Senkowski*, 76 F.3d 61, 63–65 (2d Cir. 1996).

*United States v. Potter*, 927 F.3d at 451.

Potter also noted cases wherein statements requesting an attorney were sufficient to trigger *Edwards*:

> We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone "until I can see my attorney," *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010), or directed the police to "call his attorney's phone number," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). We have even reached that result when a person said "maybe I should talk to an attorney by the name of William Evans." *Abela v. Martin*, 380 F.3d 915, 926–27 (6th Cir. 2004), abrogated on other grounds by *Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). Despite the "maybe" in this statement, we said that the surrounding circumstances—the suspect referred to a specific attorney, the suspect handed the officer the attorney's business card, and the officer said that he would call the attorney—turned what would otherwise be an equivocal request into an unambiguous one. *Id.; see Scott*, 693 F.3d at 719–20.

*United States v. Potter*, 927 F.3d at 451.

Thus, the question here becomes "in which camp" Sawyer's statements to the officers fall. Again, the "mere mention of an attorney does not cut it, "[n]or does a question about having an attorney." *United States v. Potter*, 927 F.3d at 451. "A more direct request for counsel is required." *United States v. Abdi*, 827 F. App'x 499, 510 (6th Cir. 2020).

That is precisely what we have here. Within less than two minutes of having been quickly read his *Miranda* rights, and in response to a question from the officers as to whether he has a profile on the website at issue, Sawyer said, "I'll have my lawyer . . . *I want a lawyer.*" This Court concludes that was an unambiguous request for counsel. As a result, under the bright-line rule established in *Edwards*, as soon as Sawyer made that statement all questioning was required to cease.

The Government contends that Sawyer's statement of "I want a lawyer" was somehow ambiguous because Sawyer also said he'd "rather listen." Notably, however, that statement about listening was made *after* Sawyer said "I want a lawyer" *and in response to further questioning* from Special Agent Hughes. There was no ambiguity in Sawyer's statement of "I want a lawyer." Moreover, Sawyer's later statements of "I'd rather listen" and "I don't wanna talk" are consistent with his invocation of his right to not speak to the officers without a lawyer.

Sawyer did not relent, answer questions, and give incriminating statements until *after*: 1) Special Agent Hughes told Sawyer "it's really one thing or the other. Like, we can talk to you a little bit about why we're here, or you can have a lawyer;" and 2) Special Agent Hughes told Sawyer they would have to "tear this house apart and leave it in shambles" and another officer noted how stressed out and emotional Sawyer's mother was and questioned "how she would deal with us ripping this entire place apart."

11

Sawyer unequivocally said "I want a lawyer" within two minutes of being read his *Miranda* rights and in response to questioning from the officers. "If we required more in this situation, we would essentially invite officers to ask, 'But are you really sure?' before the right to counsel is invoked." *United States v. Zakhari, supra*, at *6. As the Sixth Circuit explained in *Zakhari,* "such a standard would drain *Miranda* of meaning and undermine the ease of *Edwards*." *Id.*

This Court concludes that Sawyer adequately invoked his Fifth Amendment right to counsel and the Court will grant his motion and suppress the statements he made to officers on April 26, 2023.

## CONCLUSION & ORDER

For the reasons set forth above, the Court **GRANTS** Defendant Sawyer's Motion to Suppress Statements and **SUPPRESSES** the entirety of his interrogation that occurred on April 26, 2023.

**IT IS SO ORDERED.**

                                                     s/Sean F. Cox
                                                     Sean F. Cox
                                                     United States District Judge

Dated: November 14, 2023